## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

     Plaintiff

     v.

**MERCURY MARKETING, LLC**
2333 S.W. 181st Terrace
Miramar, FL 33029

**BEHAVIORAL HEALTHCARE GROUP
OF AMERICA, LLC, also d/b/a
Behavioral Health Care of America**
400 Redland Court, Suite 102
Owings Mills, MD 21117
Baltimore County

**JLUX CONSULTING LLC**
7433 E. Windsor Avenue
Scottsdale, AZ 85257

**MALIBU DETOX, LLC, also
d/b/a Malibu Detox & Residential Center**
22766 Saddle Peak Road
Topanga, CA 90290

**MALIBU RECOVERY CENTER, LLC**
1777 Avenue of the States, Suite 204
Lakewood, NJ 08701

**ALIYA HEALTH GROUP, LLC**
1777 Avenue of the States, Suite 204
Lakewood, NJ 08701

**FENNASIDE, LLC**
2333 S.W. 181st Terrace
Miramar, FL 33029

**JHEL HOLDINGS, LLC**
400 Redland Court, Suite 102

Case No. _____

**COMPLAINT FOR PERMANENT
INJUNCTION, CIVIL PENALTY
JUDGMENTS, AND OTHER RELIEF**

1

Owings Mills, MD 21117
Baltimore County

**CHRISTOPHER LIVOLSI**
20 Camelot Court
Stamford, CT 06907

**DENNIS RINKER**
6770 Congress Ave, PH2
Boca Raton, FL 33487

**ROBBY STEMPLER**
19 Evan Way
Baltimore, MD 21208
Baltimore County

**JENNIFER RUSS**
7433 E. Windsor Avenue
Scottsdale, AZ 85257

      Defendants.

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.      The FTC brings this action for Defendants' violations of Sections 5(a)(1) and 12 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a)(1) & 52, Section 8023(a) of the Opioid Addiction Recovery Fraud Prevention Act of 2018 ("OARFPA"), 15 U.S.C. § 45d(a), and the Commission's Trade Regulation Rule on the Impersonation of Government and Businesses ("Impersonation Rule"), 16 C.F.R. Part 461. Defendants have lured consumers to substance use disorder treatment facilities, including facilities that they themselves owned, using deceptive Google search ads ("Search Ads") and call center telemarketers who have misled callers responding to those ads. For these violations, the FTC seeks relief, including a permanent injunction, civil penalties, and other relief pursuant to Sections 5(m)(1)(A), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 57b, and OARFPA.

## SUMMARY OF THE CASE

2.      This case challenges a deceptive scheme targeting an extremely vulnerable group of Americans: consumers seeking treatment for substance use disorders ("SUD"). The scheme has two phases – lead generation and telemarketing – and three primary groups of defendants: (1) the "Mercury Defendants"; (2) the "Malibu Defendants"; and (3) the "Aliya Defendants."

3.      During the lead generation phase, the Mercury Defendants create deceptive mobile Search Ads that impersonate specific SUD treatment facilities consumers search for on Google. Those ads have an integrated phone number that appears to be for the searched-for facility, but instead instantly routes callers to one of the Mercury Defendants' clients, who have included SUD treatment facilities and lead brokers who resell those consumer leads to their own SUD treatment facility clients. The Mercury Defendants' clients have included the Malibu Defendants, who purchased thousands of leads generated by the Mercury Defendants' ads. The Aliya Defendants started receiving leads generated by the Mercury Defendants' ads in mid-2023.

4.      During the telemarketing phase, the Malibu Defendants, through their call center, Behavioral Healthcare Group of America ("BHG"), would continue the deception that began with the misleading ads: telemarketers have told callers – falsely – that they work for the facility the consumer had searched for or for a central SUD treatment clearing house and have used other misrepresentations in order to convert the lead into an admission.

5.      Defendants Jennifer Russ and JLux Consulting, LLC have furthered the deceptive scheme by providing the Malibu Defendants with detailed monthly call center analytics and – based on Russ's review of actual conversations between callers and the BHG call center – assessments of the strengths and weaknesses of individual call center agents' performance. Russ has done so despite knowing that callers who reached BHG thought they were contacting another

3

facility and that BHG's agents were misleading these vulnerable individuals in order to produce admissions for Malibu Detox.

6.      In mid-2023, Malibu Recovery, one of the Aliya Defendants, purchased the treatment facilities previously operated by the Malibu Defendants, with Aliya Health Group helping to arrange the purchase and serving as co-guarantor of a $2.5 million promissory note. The Aliya Defendants then continued using the Malibu Defendants' call center to recruit patients to Malibu Recovery and other Aliya-branded SUD treatment facilities using the same deceptive techniques, and Russ and JLux provided analyses of call center performance to Aliya personnel.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

8.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(1), (c)(2), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

9.       The FTC is an agency of the United States Government created by the FTC Act, which authorizes the Commission to commence this district court action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce, and Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce. The FTC also enforces OARFPA, 15 U.S.C. § 45d, which prohibits unfair or deceptive acts or practices in connection with SUD treatment products and services, and the Impersonation Rule, 16 C.F.R. Part 461, which prohibits the impersonation of the government and businesses.

## DEFENDANTS

10.     As used in this Complaint, the "Mercury Defendants" are Defendants Christopher LiVolsi, Dennis Rinker, Mercury Marketing, LLC, and Fennaside, LLC.

11.     As used in this Complaint, the "Malibu Defendants" are Defendants Christopher LiVolsi; Dennis Rinker; Fennaside, LLC; Robby Stempler; Malibu Detox, LLC; JHEL Holdings, LLC; and Behavioral Healthcare Group of America, LLC.

12.     As used in this Complaint, "the Aliya Defendants" are Defendants Malibu Recovery, LLC and Aliya Health Group, LLC.

### Corporate Defendants

13.     Defendant Mercury Marketing, LLC ("Mercury Marketing") is a Delaware limited liability company with its principal address at 2333 S.W. 181st Terrace, Miramar, FL 33029. Mercury Marketing is owned by Christopher LiVolsi (70%) and Dennis Rinker (30%). Mercury Marketing creates online advertisements targeted at individuals seeking SUD treatment. The ads, which are typically targeted to mobile devices, generate phone calls ("leads") that Mercury Marketing sells to SUD treatment facilities or lead brokers (who resell them to their own clients). Mercury Marketing transacts or has transacted business in this District and throughout the United States.

14.     Defendant Behavioral Healthcare Group of America, LLC ("BHG"), also d/b/a Behavioral Health Care of America, is a Maryland limited liability company with its principal address at 400 Redland Court, Suite 102, Owings Mills, MD 21117. BHG has handled phone calls from consumers responding to deceptive Search Ads and has provided telemarketing services for the Malibu Defendants and for the Aliya Defendants. BHG transacts or has transacted business in this District and throughout the United States.

5

15.     Defendant JLux Consulting, LLC ("JLux") is an Arizona limited liability company with its principal address at 7433 E. Windsor Avenue, Scottsdale, AZ 85257. JLux is a digital marketing agency whose services include providing detailed monthly reports analyzing the performance of call centers and critiquing the performance of individual call center agents. JLux has performed work for Mercury, BHG, Malibu Detox, and Malibu Recovery. JLux transacts or has transacted business in this District and throughout the United States.

16.     Defendant Malibu Detox, LLC ("Malibu Detox"), also d/b/a Malibu Detox & Residential Center, is a California limited liability company with its principal address at 22766 Saddle Peak Road, Topanga, CA 90290. Malibu Detox operated SUD treatment facilities in California until June 2023, when its assets were sold to Malibu Recovery Center, LLC. After the asset sale, Malibu Detox continued to coordinate intake and marketing support services on behalf of those facilities. Defendants Robby Stempler and Christopher LiVolsi own Malibu Detox through their respective holding companies: JHEL Holdings, LLC for Stempler and Fennaside, LLC for LiVolsi. Malibu Detox transacts or has transacted business in this District and throughout the United States.

17.     Defendant Malibu Recovery Center, LLC ("Malibu Recovery") is a Delaware limited liability company with its principal address at 1777 Avenue of the States, Suite 204, Lakewood, NJ 08701. In June 2023, Malibu Recovery purchased Malibu Detox's assets and assumed operation of its facilities; it continued using the deceptive marketing and call center services of the Mercury Defendants, the Malibu Defendants, and JLux after the purchase. Malibu Recovery transacts or has transacted business in this District and throughout the United States.

18.     Defendant Aliya Health Group, LLC ("Aliya") is a Delaware limited liability company with its principal address at 1777 Avenue of the States, Suite 204, Lakewood, NJ

08701. Aliya is a nationwide network of addiction and mental health treatment centers, including Malibu Recovery, that are owned or operated by a series of limited liability companies. Aliya personnel were involved in Malibu Recovery's June 2023 purchase of Malibu Detox's assets and in patient recruitment following that purchase. Aliya transacts or has transacted business in this District and throughout the United States.

19.     Defendant Fennaside, LLC ("Fennaside") is a Florida limited liability company with its principal address at 2333 S.W. 181st Terrace, Miramar, FL 33029. Fennaside is owned by Christopher LiVolsi, who is also the authorized member of the company. Fennaside is a holding company that receives the management fees Defendant LiVolsi earns for his Mercury Marketing work and has held his 20% interest in Malibu Detox. Fennaside transacts or has transacted business in this District and throughout the United States.

20.     Defendant JHEL Holdings, LLC ("JHEL") is a Maryland limited liability company with its principal address at 400 Redland Avenue, Suite 102, Owings Mills, MD 21117. Defendant Robby Stempler is the sole owner and resident agent of JHEL. JHEL is a holding company that has held Stempler's 80% ownership interest in Malibu Detox. JHEL transacts or has transacted business in this District and throughout the United States.

## Individual Defendants

21.     Defendant Christopher LiVolsi is the majority owner of Mercury Marketing. He also is or has been part owner, directly or indirectly, of several SUD treatment facilities, including Malibu Detox, to which he sells leads generated by Mercury Marketing's ads. Defendant LiVolsi creates and manages advertising campaigns for Mercury Marketing's clients using the Google Ads platform. He also participates in routing the resulting leads to Mercury Marketing's clients, and he supervised the operations of the Malibu Defendants' call center.

22.     At all times relevant to this Complaint, acting alone or in concert with others, Defendant LiVolsi has formulated, directed, controlled, had the authority to control, or participated in the deceptive lead generation and telemarketing acts and practices described in this Complaint. Defendant LiVolsi resides in Connecticut and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

23.     Dennis Rinker is part owner of Mercury Marketing. He creates advertisements for Mercury Marketing clients and manages customer relationships and retention for Mercury Marketing. For some time, Defendant Rinker also owned 7.5% of Malibu Detox. In exchange for selling his ownership interest in Malibu Detox, Rinker received money for every lead received by Malibu Detox.

24.     At all times relevant to this Complaint, acting alone or in concert with others, Defendant Rinker has formulated, directed, controlled, had the authority to control, or participated in the deceptive lead generation acts and practices described in this Complaint. At certain times relevant to this Complaint, acting alone or in concert with others, Defendant Rinker has also formulated, directed, controlled, had the authority to control, or participated in the deceptive telemarketing acts and practices described in this Complaint. Defendant Rinker resides in Florida and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

25.     Robby Stempler is the managing member and Chief Executive Officer of Malibu Detox. He is also the sole owner of JHEL and the sole member of BHG. Through JHEL, Stempler is or has been majority owner and a control person of Malibu Detox.

26.    At all times relevant to this Complaint, acting alone or in concert with others, Defendant Stempler has formulated, directed, controlled, had the authority to control, or participated in the deceptive lead generation and telemarketing acts and practices described in this Complaint. Defendant Stempler resides in Maryland and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

27.    Jennifer Russ is the organizer and sole member of JLux Consulting. She listened to many hundreds of calls to and from BHG and provided detailed monthly reports analyzing BHG's overall performance, as well as the performance of individual call center agents.

28.    At all times relevant to this Complaint, acting alone or in concert with others, Defendant Russ participated in the acts and practices of JLux Consulting, including the deceptive telemarketing acts and practices described in this Complaint. Defendant Russ resides in Arizona and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMERCE

29.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### The Lead Generation Phase – the Mercury Defendants' Deceptive Search Ads

30.    Since at least January 1, 2021, the Mercury Defendants have used deceptive Search Ads to generate incoming phone calls for their clients. Those clients have included SUD

treatment facilities in which Defendant LiVolsi has an ownership interest, SUD treatment facilities owned by others, and third-party lead brokers.

31.     The Mercury Defendants' Search Ads, which are typically targeted to mobile devices, display a phone number the consumer can "click-to-call" or dial manually.

32.     To create their Search Ads, the Mercury Defendants first designate "keywords," which are terms or phrases they think consumers are likely to use when searching for SUD treatment. Among the thousands of keywords the Mercury Defendants have designated are the names of hundreds of specific SUD treatment facilities.

33.     Using a Google feature called Dynamic Keyword Insertion ("DKI"), the Mercury Defendants direct Google's ad platform to <u>insert</u> the consumer's searched-for keyword into the headline or text (or both) of the Search Ad displayed to the consumer in response to that search. The consumer thus sees a Search Ad with headlines or textual descriptions <u>displaying the name of the searched-for SUD facility</u>.

34.     The Mercury Defendants have also registered and paid for dozens of Internet domains ("URLs"), including some that imply access to SUD treatment, such as: "help.admission-now.com"; "call.admission-now.com"; "call.admissions-now.com;" and "sobrietychoices.com." Many Search Ads displaying the Mercury Defendants' URLs directed calls to the Malibu Defendants' telemarketers.

35.     For example, through the use of the above techniques, the Mercury Defendants caused the following Search Ads – all of which included the same URL and phone number and virtually the same text – to be displayed in response to mobile phone searches for, respectively, "cumberland heights nashville TN," "menninger clinic," and "valley of hope chandler az":







36.     The URL and phone number in these three Search Ads belonged to the Mercury

Defendants, not to any of the SUD treatment facilities whose names appeared in the ads.

37.     The Mercury Defendants' Google Ads campaign with the (888) 851-2329 phone number prompted nearly 29,000 phone calls between June 15, 2021, and October 10, 2022, and was one of many similar campaigns created by the Mercury Defendants.

38.     From 2021 to 2023, the Mercury Defendants created scores of DKI ad campaigns that generated hundreds of thousands of SUD Search Ads similar to the ones depicted in Paragraph 35, including ads that produced phone calls that the Mercury Defendants routed to the Malibu Defendants.

39.     Mercury Marketing pays Google for each instance in which a consumer "clicks" on one of its ads. Mercury Marketing paid Google at least $8.01 million in 2021 and at least $10.9 million in 2022.

40.     The Mercury Defendants instantly and seamlessly route to their clients the incoming calls placed in response to their Search Ads, and they charge those clients for each call.

41.     Mercury Marketing's income from SUD advertising and the sale of leads generated from that advertising to its clients was at least $9.0 million in 2021 and at least $12.9 million in 2022.

42.     Between January 2021 and May 2022, Mercury Marketing billed Malibu Detox and BHG nearly $1.8 million for PPC Media. These invoices were for the more than 25,000 instances in which consumers "clicked" on pay-per-click advertising that Mercury had run on behalf of the Malibu Defendants.

43.     Between June 15, 2021, and October 10, 2022, the Mercury Defendants routed more than 3,500 calls generated by the campaign that used the (888) 851-2329 phone number to the Malibu Defendants.

44.    Beginning on or about June 23, 2023, BHG started sending the Aliya Defendants leads resulting from the Mercury Defendants' Search Ads.

45.    The Mercury Defendants have continued their practice of impersonating SUD treatment facilities with which they have no affiliation even after the FTC promulgated the Impersonation Rule. For example, although the Mercury Defendants have no relationship with Serenity Lane, the following ad, placed by a Google verified account for Mercury Marketing, was displayed on July 3, 2024, after searching for "serenity lane":



### The Telemarketing Phase – Two "Fronters" and a "Closer"

46.    As a result of the Mercury Defendants' deceptive Search Ads, many consumers have been instantly and seamlessly routed to a telemarketer working for the Malibu Defendants rather than to the SUD treatment service they were actually trying to reach when they called the phone number in the Search Ad.

47.    These telemarketers have then continued the masquerade started in the Search Ads while trying to convert the lead into an admission through a series of scripted phone calls:

two calls handled by a "fronter" – the telemarketer who answered the consumer's initial call –

and a final call by a "closer."

48.     Upon answering the initial incoming call, the "fronter" attempts to extract

identifying and insurance information from the caller and obtain a verification of benefits, when

applicable, even if the caller is clearly trying to get into another SUD treatment facility or has

already been in contact with that other facility. Fronters do this by first telling callers they have

reached "admissions," and asking if the caller is seeking help "for yourself or a loved one."

Fronters do not reveal that consumers have reached the Malibu Defendants' call center. Instead,

they either continue impersonating the searched-for clinic, saying that "we work with them," or

pretend to be an independent "central admissions" help line trying to find the best treatment

option for consumers. Below are excerpts from transcripts of incoming "fronter" phone

conversations between the Malibu Defendants' telemarketers and callers seeking SUD treatment:

A.     AGENT: Admissions, this is Jennifer.
CONSUMER: Hi Jennifer, is this Cumberland Heights?
AGENT: This is the admissions department – are you calling in for yourself or are you looking for help for a loved one?
CONSUMER: No, for a loved one; but it is Cumberland Heights, correct?
AGENT: I'm in the admissions department, correct.

B.     AGENT: Yes, this is Jennifer.
CONSUMER: Hello?
AGENT: Hi, admissions.
CONSUMER: I'm well, I'm sorry, I didn't, who am I calling?
AGENT: The admissions department. My name is Jennifer. What's your name?
CONSUMER: Admissions of Sunrise, correct?
AGENT: I'm in the admissions office, yes. What are you calling, for yourself or a loved one or are you looking for a current person?
CONSUMER: Yes, I'm calling for myself. I'm just making sure I'm calling the right place. Sunrise in Cherry Hill.
AGENT: Okay, are you, what are you struggling with?
CONSUMER: Benzos. I already talked to Mike. I just have Mike Sunrise. He gave me his number here [name] he told me to call him back but unfortunately he didn't answer.

14

AGENT: Okay, I can help you. What – umm benzos – what's your name and your date of birth?

C.     AGENT: Admissions, this is Katira.
CONSUMER: Hi, is this Sunrise Detox in Tom's River?
AGENT: Yes, we do work with them. Are you seeking help for yourself or a loved one?

49.     Fronters continue this charade even in the face of callers' repeated requests for

confirmation that they have reached the facility they searched for:

A.     CONSUMER: Hello
AGENT: Hello, Admissions.
CONSUMER: Is this Greenleaf?
AGENT: This is the admissions department, are you calling for yourself or for a loved one?
CONSUMER: Is this Greenleaf?
AGENT: This is the admissions department sir. How can I help you?
CONSUMER: [more loudly] At Greenleaf? I'm asking you is it Greenleaf? I want to make sure I'm in the right place. Ma'am?
AGENT: Yes, I'm a central admissions line for substance abuse and mental health. How can I help you?
CONSUMER: But is this Greenleaf Hospital, again?
AGENT: I'm a central admissions line for substance abuse and mental health. I work with several different facilities.
CONSUMER: Oh no, I need to get straight to the hospital [hang up]

B.     AGENT: Admissions, this is Jennifer.
CONSUMER: Is this Pathways?
AGENT: This is the admissions department. Are you calling in for yourself, a loved one, or a current patient?
CONSUMER: Is this Pathways or not?
AGENT: This is the admissions department.
CONSUMER: What do you mean the admissions department, is this Pathways or not? Where are we calling to?
AGENT: My name is Jennifer, I am a central admissions line for substance abuse and mental health. I work with several different facilities.
CONSUMER: So, you're not Pathways?
AGENT: I'm in the admissions office.
CONSUMER: Admissions office to where?
AGENT: Okay, I'm a central admissions line for substance abuse and mental health. I work with several facilities.
CONSUMER: Can you get me to Pathways?
AGENT: What are you currently struggling with?

15

50.    Potential patients who can provide hefty sums for treatment, either via private insurance with SUD treatment benefits or with cash, are particularly attractive prospects for many SUD treatment facilities, including Malibu Detox. Obtaining the caller's insurance information has therefore been critical for the fronters, who continue to pretend they are employed by the specific clinic the consumer intended to call. They have even resorted to further deception to extract (or "snake" as they call it) insurance information from callers. This includes lying to consumers who thought they had reached an SUD treatment facility that already had their insurance information, by claiming that the information had been deleted pursuant to federal health privacy laws:

A.    AGENT: Admissions, this is Katira.
CONSUMER: Hi, is this Sunrise Detox in Tom's River?
AGENT: Yes, we do work with them. Are you seeking help for yourself or a loved one?
***
CONSUMER: I've been there twice before and, I don't even know how to say it; I guess I'm comfortable with that place only because it's local to my home.
AGENT: Mmm Hmm.
CONSUMER: I just got out of a 30-day rehabilitation down in Florida.
AGENT: What happened there?
CONSUMER: Well, they did a great job but I just didn't do my job.
***
AGENT: Are you covered by any health insurance through the state, employer, or loved one?
CONSUMER: Yeah, my job.
AGENT: Do you have that information available, that way we can see if you have coverage?
CONSUMER: No, I don't but I've been to Sunrise two other times and I have the same insurance.
AGENT: So due to HIPAA laws they do get rid of that information so when you come in we have to get the information again because they do get rid of it.

B.    AGENT: Admissions, this is Julia.
CONSUMER: Are you guys filled up or can you take one more reject?
AGENT: So, were you looking for help for yourself or for a loved one today?
***
AGENT: Are you currently covered by any health insurance through the state or through an employer?

***
CONSUMER: You guys should have me on record – I was just there, like, two weeks ago?
***
CONSUMER: You should have it on file; it's the same insurance that I used when I was there last time. I can get it for you if you want.
AGENT: Yeah, I'm gonna need that again because once someone leaves, due to HIPAA, all records are wiped for privacy laws.

51.    After extracting the insurance information of callers with private coverage, BHG's fronters walk those callers through a series of questions concerning substance use, health history, and related matters, and then tell the callers that they will hear back shortly with the insurance and clinical teams' treatment recommendation.

52.    For Malibu Detox, when the fronter did call back, it was with the news that the insurance and clinical teams were recommending treatment at Malibu Detox, and that private insurance would cover the cost. Fronters often touted Malibu Detox's luxury amenities and laid the foundation for the "closer" – Malibu Detox's Director of Admissions – to call with help on travel plans, while still never telling the caller that they worked for the very facility they were recommending:

A.    CONSUMER: Hello
AGENT: Hi, this is Jennifer in the admissions department. I just had a call from this number and there was a bunch of static.
CONSUMER: Oh yes, hi, are you at Harmony in Estes Park?
AGENT: I'm in the admissions department. Are you calling for yourself or a loved one?
CONSUMER: For myself.
***
[Callback from Jennifer]
CONSUMER: Hi this is [name].
AGENT: Hi [name], it's Jennifer.
***
AGENT: Okay. Ready? So, I have some really good news for you, okay?
CONSUMER: Okay, excellent.
AGENT: Okay, so I heard back from the clinical team, and I heard back from the insurance verification department. Um, the clinical team is recommending you to

go to Malibu Detox in California at no cost to you because they think you need a higher level of care. Okay?

CONSUMER: Than you guys can offer?

AGENT: Correct.

CONSUMER: Okay, well, how am I gonna get there?

AGENT: I spoke to Earl, he is a director of admissions over at Malibu Detox and he is gonna call you and coordinate and assist transportation with you. Okay?

CONSUMER: Like I'm gonna have to get on an airplane?

AGENT: Yes. You're gonna get on your airplane. You can have [name] drive you to the airport, uh, tomorrow 'cause I know they have immediate bed openings, and um, Earl will have someone from Malibu Detox pick you up from the airport.

CONSUMER: Jennifer, how come you guys can't take me?

AGENT: The clinical team is recommending you need a higher level of care. Okay, you've been there – you've been at Harmony – four times, and they, you know, something's not working.

CONSUMER: But I need help now!

AGENT: I know, so that's the thing, because of COVID, the majority of the treatment – remember how I told you before, everywhere has waiting lists? Remember I told you?

CONSUMER: Mhm – I need help now.

AGENT: Okay, I know you need help now. Yeah, I know that you need help now and Malibu Detox has immediate openings and the clinical team is recommending that you do need a higher level of care. It's gonna be okay. Something's not working, you know, over at the Harmony House, somethings not working there. Okay? So, we're gonna get you in somewhere else, where they're gonna be able to help you. You're gonna get — you're gonna medically detox, and we're gonna get you properly diagnosed, because I know that you're on a lot of pills, a lot of different medication, okay? We're gonna get you feeling better.

CONSUMER: Alright, well gosh, I really wanted to come up to you guys.

AGENT: I know. But you're gonna go to – it's okay! It's okay!

CONSUMER: But I haven't been taking those pills; I haven't been taking them for three weeks.

AGENT: I know, and so, but you not taking those pills is also a problem. So, you need to — you need to get detoxed, you need to — you need to get stable on your meds again —

CONSUMER: But I can't get on an airplane and get detoxed.

AGENT: No, they're going to pick you [cross talk]

CONSUMER: [crying]

AGENT: No, it's okay — you're gonna get on an airplane. You're gonna get on the airplane, you're gonna fly to California. [Redacted] is gonna wait 'til you get on the plane. Someone from Malibu Detox is gonna be there to pick you up. You're gonna go to the house — it's a private treatment center — you're gonna go to the house and they're gonna make sure you're comfortable while you detox. It's only 6 to 10 beds there, okay? There's a nutritionist, there's a private chef, there's you know, a bunch of therapists, you're gonna have some groups. You're

going to come home feeling amazing. Okay? You're already a couple steps ahead of everyone because, you know, a lot of people there.

CONSUMER: Okay, where do I go?

AGENT: You're gonna be going to Malibu Detox. I will have Earl, he is a director of admissions for Malibu Detox, I'm gonna have him call you right now, Okay?

CONSUMER: Okay, okay.

AGENT: Okay. It's okay, Miss [name], this is a great opportunity! Okay?

CONSUMER: Okay, thank you.

AGENT: You're welcome, I'm gonna have him [cross talk]

CONSUMER: Thank you.

AGENT: You're very welcome, Miss [name]. Call me if you need anything; I'm going to have Earl call you right now, okay? Answer your phone.

CONSUMER: Okay, thank you, I appreciate it.

AGENT: You're very welcome. You're gonna feel so much better. It's okay, okay?

CONSUMER: Okay, thank you.

AGENT: You're welcome. Bye.

B.    AGENT: Good morning, it's Sierra, giving you a call back from yesterday?

CONSUMER: Yes.

AGENT: Hi! So, we have some excellent news. Um, so I heard back from the clinical department and the insurance department. Just based on [name]'s relapse, on the fact that she was just in treatment and is now needing treatment so quickly back-to-back and how old she is, the clinical team has determined that Malibu Detox and Residential Treatment Center would be best path for her for long term sobriety and it is covered by your insurance.

CONSUMER: Okay. What's that? Malibu?

AGENT: Yes ma'am. Malibu Detox and Residential Treatment Center. Um, its located at the top of the mountain in Malibu. It oversees the ocean. It's very, very beautiful and I'm really happy they picked that place for her 'cause it kinda touches home with me. I have a friend that went there, and it was amazing, she had an amazing experience; very beautiful. Um, it's a five-star facility and they took really good care of her. They have a maximum of 20 clients at a time so it's very, very intimate and individualized. Um that way [name] can get that one-on-one care compared to like a huge facility that she can kinda get lost in the crowd. Cause with — but, um, they have [unintelligible]

CONSUMER: How much is that going to cost?

AGENT: It's covered by your insurance. It's covered.

CONSUMER: Fully?

AGENT: Yes ma'am. Yes ma'am. They will coordinate and assist with travel; they have a department to arrange everything. It's really an incredible opportunity, which is why we took so long, because we wanted to verify on the insurance end of it. So, it is covered and what I can have happen is the director of admissions, his name is Earl, he can call you personally. He is gonna be able to explain the program and help set up travel and everything like that.

19

CONSUMER: Okay, now, travel is on my end, that I pay? Right?

AGENT: No ma'am. The insurance. Everything is them. All you have to do is help [name] get herself together and get her to the airport, but they will coordinate and assist you with your travel.

CONSUMER: Okay.

AGENT: So, he'll go with you; he'll come up with the best time to book the flight. You don't have to do anything from this point.

CONSUMER: Okay.

AGENT: Okay?

CONSUMER: And that's in Malibu in Florida?

AGENT: Malibu, California.

CONSUMER: Malibu, California. Okay.

AGENT: Yes ma'am. So, from this point, I'm gonna have Earl, he's gonna call you. Give him about 5 to 10 minutes or so. He's gonna be able to reach out and explain everything to you; walk you through the program and help you set up that travel.

53.     Fronters have typically disregarded the desire of callers with private insurance who want to return to a facility where they stayed previously, often telling the caller that they need to change their "people, place, and things," and that their insurance covers a higher level of care than would be provided at the previous facility:

A.     AGENT: Okay, alright. So, here's the thing. Umm, I just finished your assessment. I'm going to get it over to our clinical team. What I'm going to do is I'm going to text you my, my direct line here okay. Umm, I'm going to text you my direct line here, and, again, my name's Jennifer, and I'm going to give you a call back as soon as I hear from the clinical team and from the insurance verification department, okay I'm shooting for Cherry Hill.

CONSUMER: Okay, this is Cherry Hill, right?

AGENT: No, I'm a central admission line for substance abuse and mental health. I work with that facility. I work with, I work with about 20 different facilities across the United States.

CONSUMER: Okay, I just want to make sure; Cherry Hill is what we're shooting for here.

AGENT: Right, everywhere has waiting lists right now, sir, so I'm going to try to get you in somewhere as soon as possible. I'll definitely put that on the assessment. Okay? I'll attach that along with it.

CONSUMER: Okay, I thought I called the Cherry Hill number. I'm sorry, that's my mistake, I just did this [under breath 'Jesus Christ']

AGENT: Sir, I'm going to help you, I promise you, okay?

CONSUMER: Okay

AGENT: Give me about 10 minutes and let me give you a call back, okay?

***

[Jennifer call back]
CONSUMER: Hello
AGENT: Hello, ____, it's Jennifer
CONSUMER: Jennifer
AGENT: Hi, here's the thing. I think God must be on your side, ahh, big time. I don't, it normally takes about 20 minutes to get something back from the clinical team and the insurance verification department. I, I actually have some really good news for you. Umm, so, well, so they think that you do need a higher level of care because you're in treatment less than a year ago. So, they, have you ever been to private treatment?
CONSUMER: Have you – what?
AGENT: Okay, so, you've been approved by your insurance and it's been clinically recommended for you to go to a small private ahh detox center. It's like six to ten beds. Umm, everywhere has a waiting list right now of like three plus weeks to get into.
CONSUMER: Oh yeah I already started packing. The guy just told me I can come to Cherry Hill. It's right by my mom's work. Everything works out fantastic, I just have my doctor fax the suboxone letter over there because you know how much that I have to have before me.
AGENT: So, I just got off the phone with the clinical team and they're recommending that you have a higher level of care and that you go to Malibu Detox.
CONSUMER: Okay, well, I… it's a recommendation and I'm …
AGENT: They're going to … and what?
CONSUMER: And, well that's a recommendation and I appreciate the recommendation but I would like to decline their recommendation.
AGENT: I mean, so, it, you know, all treatment centers aren't created equal and this is an amazing opportunity, umm, you know, I can get you, I can have Earl, he's the director of Malibu Detox, contact you and he can assist and coordinate with you. They'll get you on a plane tomorrow.
CONSUMER: Look, I just got done telling my job and everything that I'm going to Sunrise, and then, whatchamacallit Ambrosia, it's not Ambrosia no more, Pineland. They just got done …
AGENT: It's okay, if you give me their number and I will call your EAP and I will let him know that you're going to get on a plane tomorrow and fly out to California. You're going to go, and you're going to go to Malibu Detox.
CONSUMER: No, I can't fly. I'm on… I can't leave the state. The only way, the only way I'm able to leave Pennsylvania is because New Jersey is like right there.
AGENT: Why can't you leave the state?
CONSUMER: I have pending DUI …
AGENT: It's, there's a case manager …
CONSUMER: … not to mention probation I'm still on for 2020 which has never been resolved yet.

AGENT: It's okay, they have case managers and they can, they'll, it's okay, you can come out. You are going to treatment. You're flying out to one of the nation's top rated treatment facilities. I promise you no judge, and no one's going to care, they're not going to …

CONSUMER: I got, for someone flying me out to Florida last time, I got put in front of the judge and almost sent to do time just because I went to rehab …

AGENT: I can have someone, I can, there's someone …

CONSUMER: I would really like someone else to have this opportunity and I just want what I was planning for.

AGENT: Look, sir, it's morally wrong to go somewhere that you haven't been clinically recommended to go to. I pro … there's case managers there. Someone can reach out and make sure you will not get in trouble for going to treatment. Okay … very highly recommended.

CONSUMER: I can't fly out there, I can't fly.

AGENT: Why can't you fly?

CONSUMER: I have kids here, I have family here, I can't….

AGENT: That's okay

CONSUMER: No

AGENT: You can take 30 days. Sir, we, look, you just said you're spending all your checks, I'm not trying to, you know, you just said you're spending all your checks on pills.

CONSUMER: Yes, you're absolutely right.

AGENT: What good are you right now to your family? You're taking pills on pills on pills with suboxone and that other stuff. That's really dangerous to be doing all that.

CONSUMER: Very dangerous

AGENT: It really is. It is.

CONSUMER: And Sunrise has helped me a lot. And I'm not much of a troublemaker there either.

AGENT: Sir, what would you lose getting on a plane with everything taken care of at no cost to you, you're not going to have a bill that you have to pay, your insurance will cover everything for you to fly out to Malibu Detox, go get some help, and come home and be an asset to your family.

CONSUMER: Or like some stories I've heard, get stuck in California.

AGENT: Why, get stuck in California doing what? There's people there…sir, it's Malibu Detox. It's rated …

CONSUMER: I was told by a gentleman to be at Sunrise by 8 o'clock. I'm packing, I'm doing my laundry. This, I'm awesome at this … I'm thrilled that this is a great thing but I'm sure there's somebody else that they can give this to.

AGENT: Sir, it's not morally correct for you to go to a treatment center that hasn't been, you know, recommended. Have you been to this place before?

CONSUMER: To what place, Passages Malibu?

AGENT: You're not going to Passages, you're going to Malibu Detox.

CONSUMER: Malibu Detox in Malibu California?

AGENT: Yes, it's a small six to ten bed treatment center – treatment facility – it's not a building, it's a house, it's a luxury home. You're going to be there, you're going to detox medically. You're going to … they're going to check and see, you know, you're going to be able to talk to a psychiatrist, a therapist…
CONSUMER: This is not, this is not, I'm just, you know what, I'm just F*** it, I'm just going to spend all my money on drugs. [Hangs up]

B.    AGENT: Admissions, this is Katira.
CONSUMER: Hi, my name is [name], are you in admissions?
AGENT: Yes, I am, are you looking for substance abuse help for yourself or a loved one?
CONSUMER: Well, it's my loved one who's on the call with me right now high as a kite.
***
AGENT: What facilities has he been to in the past?
CONSUMER: He's been to your facility three times. He's detoxed at MCC, was it MCCA? Um, did you go to Stonington? He was at Stonington for maybe a day or two.
***
AGENT: Okay, 'cause they do recommend changing your people, places, and things. If he's been to a facility three times in a row and he's still struggling they typically don't recommend going back to that same facility cause more the mindset you know if it didn't work that many times it's less likely to work again. Umm, so they may not send him to that facility but based off the recommendation I can let you know where they're going to send him but it definitely will be a higher level of care.

54.    Defendant LiVolsi devised the call center practices discussed in Paragraphs 46–53. In June 2021, he sent Malibu Detox's then-Director of Admissions four documents entitled, respectively, "3 Call Model (Trust & Warm Hand off)," "Beginning Script," "CALL 2," and "Closing Call." These documents provided the template for the deceptive telemarketing practices carried out by the Malibu Defendants' call center agents.

55.    Defendants Russ and JLux have monitored telemarketing operations and provided detailed monthly reports on call center performance to Defendants Stempler, LiVolsi, Rinker (until at least January 2023), and Aliya (after the sale of Malibu Detox's assets).

56.    Defendant Russ has reviewed call recordings in order to assess the performance of individual call center agents (e.g., did they "pitch" self-pay to patients who lacked private

insurance; how they handled callers who asked for a specific facility; how they handle objections to traveling to California). She also has occasionally met with individual agents to help them improve their performance.

57.    Defendant Russ has reported regularly to Defendants Stempler, LiVolsi, and Rinker about call center performance, including how agents handled callers who reached BHG when they were actually trying to contact an SUD treatment facility other than Malibu Detox. For example, Russ provided Stempler, LiVolsi, and Rinker with the following critiques of BHG's call center agents:

- [Agent] "needs a better answer to 'Is this _____?' She just kept saying central admissions which made the caller mad; She could explain the process of verification/assessment, we work with them, etc." (Sept. 2021)

- [Agent] "still having issues with repeating 'This is the admission department' when callers ask if [its] a specific facility. This frustrates callers." (Nov. 2021)

- [Agent] "still gets in a loop with 'this is the admissions department' when callers ask for a specific facility. Frustrates everyone." (Dec. 2021)

- [Agent] "knows a lot about recovery, he just needs to keep in mind this is sales, not a helpline. When callers ask is this... He sometimes answers no." (May 2022)

- [Agent] "[n]eed to find a way to answer callers asking about facilities by name." (June 2022)

- [Agent] "When people ask for a specific facility or person, she's saying no that's not us." (Aug. 2022)

- "[Agent] still struggles with no pitching when a caller asks f [sic] a specific facility or person by name. He needs to pivot at least to ask about insurance or sobriety." (Jan. 2023)

58.    Defendant Russ, in her reports, also has criticized fronters for acting like "directory assistance" if they deviate from BHG's script too quickly by providing callers who were trying to reach a specific facility with the phone number of that facility, instead of

"pitching." In emails to Stempler, LiVolsi, and Rinker, one agent was described as "playing directory assistance when callers ask for a specific center, when they have a placement or an appointment." Other comments reported to Stempler, with copies to LiVolsi and Rinker, included, "Her no pitches are high; directory assistance on specific facilities." and "No pitches at 21%; directory assistance BAD when a Spec Facility is mentioned."

59.    In contrast to these criticisms, Russ has frequently commended agents for "snaking VOBs [verifications of insurance benefits]" from callers who had clear intentions of going to other SUD treatment facilities.

60.    Many callers were resistant to BHG's recommendation of Malibu Detox because they were looking for treatment closer to home. Russ flagged the "travel barrier" issue to her clients, noting on one occasion to Stempler, LiVolsi, and Rinker that "Everyone could stand a refresh on overcoming travel barriers," and writing in another email to them:

> Travel barrier:
> Need to brush up on overcoming travel objections in call 2.
> Pitch getting the right help once and for all, changing people, places, etc. Plant seeds for travel in call 1.

61.    LiVolsi and Stempler have shared Russ's concerns about underperforming agents. After receiving reports from JLux, LiVolsi sometimes personally worked with the call center agents to address the concerns she raised.

62.    Stempler also was interested and personally involved in call center performance issues. For example:

- In September 2021, Stempler emailed Russ that "[he] had a meeting with the team yesterday morning and we went over all calls in September that were viable from an insurance standpoint." He asked if Russ could "review these calls with the fronter's [sic] and see what you think / give us an analysis please?"

- When Stempler didn't get a response from Russ, he asked her to copy both his Malibu Detox email address and his personal Gmail account; thereafter, she sent him reports to him at both addresses.

- On multiple occasions, Stempler asked Russ about the performance of specific call center agents.

- In January 2023, Stempler recommended firing two underperforming agents. In response to feedback about those agents, who weren't pitching Malibu Detox sufficiently, he wrote: "If this is an ongoing issue that's been addressed then they need to be let go in my opinion. Thoughts?" Shortly thereafter, he wrote: "We can't target when to let someone go but if the same problems are reoccurring after being addressed, then that's reason to fire someone."

- In February 2023, one week after Russ distributed her January call center data and noted that she was scheduling calls with two agents to "review the scripts and pivotal points for immediate wins," Stempler asked, "Has this been addressed."

63.    Fronters have earned bonuses (sometimes referred to as commissions) in addition to their base pay depending on their performance as measured by, among other factors, their conversion rate, the number of "admits" they had in a month, and whether any of those admits were "cash pay" patients.

## The Aliya Purchase and Continuing Operations

64.    In or around March 2023, Aliya's Chief Executive Officer signed a Letter of Intent stating that Aliya would create "an entity affiliated with Aliya" to purchase Malibu Detox's SUD treatment facilities and "to assume the operation" of the facilities. Malibu Recovery was the entity Aliya used for that purpose.

65.    In or around June 2023, Malibu Recovery purchased Malibu Detox's assets and assumed control of its SUD treatment facilities. Aliya co-guaranteed a $2.5 million promissory note that was part of the financing for the purchase.

66.    Malibu Recovery and Malibu Detox agreed that Malibu Detox would, during a transition period, continue providing intake and marketing services to Malibu Recovery

consistent with past practices at the SUD treatment facilities. Malibu Recovery had the right to terminate Malibu Detox's intake and marketing services upon three business days' notice.

67.     Following the asset sale, BHG continued to receive calls resulting from Mercury and LiVolsi's deceptive advertising, now on behalf of the Aliya Defendants. BHG agents then sent emails with the names of prospective clients, along with a brief description of their substance use issues and their insurance coverage, to admissions@aliyahg.com, where an Aliya Admissions Coordinator would reply that they were "on it." Some individuals whose calls went to BHG were admitted to the newly-renamed Malibu Recovery facilities, and others were admitted to Aliya facilities other than Malibu Recovery.

68.     Between July 2023 and at least November 2023, Aliya's Managing Partner and its Vice President of Admissions both communicated directly with LiVolsi about patient recruitment to Aliya facilities.

69.     In November 2023, Russ sent Stempler, LiVolsi, and Aliya's Managing Partner a report on call center performance, comparing October 2023 data to those for the previous month. Russ's report indicates multiple instances of consumers inquiring about specific facilities other than Malibu Detox or Malibu Recovery in October 2023.

70.     In December 2022, Commission staff notified LiVolsi, Rinker, Stempler, Mercury, Fennaside, and Malibu Detox that the Commission was investigating possible violations of the FTC Act and OARFPA.

71.     In December 2022, attorneys working on the Malibu Detox asset sale for Stempler notified the Aliya Defendants that the Commission was investigating Malibu Detox for possible violations of the FTC Act and OARFPA.

72.     After receiving notice of the Commission's investigation, the Mercury

Defendants and the Malibu Defendants continued their advertising and telemarketing practices, and the Aliya Defendants proceeded with the purchase of Malibu Detox and the use of Mercury's advertising, BHG's call center, and JLux's analytics.

73.    Since April 1, 2024, the Mercury Defendants have continued to disseminate advertising posing as or misrepresenting affiliation with unaffiliated SUD treatment facilities.

74.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that the Defendants are violating or are about to violate laws enforced by the Commission because, among other reasons, all of them remain engaged in the same business or industry in which they committed the unlawful acts and practices at issue, they earned significant revenues from participating in these unlawful acts and practices, and they did not immediately stop their unlawful conduct after learning that the FTC was investigating them.

## VIOLATIONS OF THE FTC ACT

75.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

76.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act. Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics. The offering for sale and sale of SUD treatment services is a "service" for purposes of Section 12 of the FTC Act, 15 U.S.C. § 52.

### Count I – Deceptive Lead Generation Ads
### (Mercury Defendants)

77.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of SUD treatment services, the Mercury Defendants have represented,

directly or indirectly, expressly or by implication, that:

A.    Search Ads the Mercury Defendants disseminate are advertisements for the SUD treatment facilities consumers searched for;

B.    The phone numbers in the Mercury Defendants' Search Ads are the phone numbers of the SUD treatment facilities consumers searched for; and

C.    Consumers who click-to-call or dial the phone numbers for the SUD treatment facilities displayed in the Mercury Defendants' Search Ads will reach the SUD treatment facilities they searched for.

78.    In fact, in numerous instances in which the Mercury Defendants have made the representations described in Paragraph 77:

A.    Search Ads the Mercury Defendants disseminated were not advertisements for the SUD treatment facilities consumers searched for;

B.    The phone numbers in the Mercury Defendants' Search Ads were not the phone numbers of the SUD treatment facilities consumers searched for; and

C.    Consumers who clicked-to-call or dialed the phone numbers for the SUD treatment facilities displayed in the Mercury Defendants' Search Ads did not reach the SUD treatment facilities they searched for.

79.    Therefore, the Mercury Defendants' representations as described in Paragraph 77 were false or misleading and constitute deceptive acts or practices and the making of false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

## Count II – Deceptive Lead Generation Ads
### (Malibu Defendants and Aliya Defendants)

80.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of SUD treatment services, the Malibu Defendants and the Aliya

Defendants, through the Mercury Defendants acting on their behalf and for their benefit, have represented, directly or indirectly, expressly or by implication, that:

    A.    Their Search Ads are advertisements for the SUD treatment facilities consumers searched for;

    B.    The phone numbers in those Search Ads are the phone numbers of the SUD treatment facilities consumers searched for; and

    C.    Consumers who click-to-call or dial the phone numbers for the SUD treatment facilities displayed in those Search Ads will reach the SUD treatment facilities they searched for.

81.    In fact, in numerous instances in which the Malibu Defendants and the Aliya Defendants, through the Mercury Defendants acting on their behalf and for their benefit, have made the representations described in Paragraph 80:

    A.    Their Search Ads were not advertisements for the SUD treatment facilities consumers searched for;

    B.    The phone numbers in those Search Ads were not the phone numbers of the SUD treatment facilities consumers searched for; and

    C.    Consumers who clicked-to-call or dialed the phone numbers for the SUD treatment facilities displayed in those Search Ads did not reach the SUD treatment facilities they searched for.

82.    Therefore, the Malibu Defendants and the Aliya Defendants' representations as described in Paragraph 80 were false or misleading and constitute deceptive acts or practices and the making of false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

**Count III – Deceptive Telemarketing**
**(Malibu Defendants, Aliya Defendants, and Defendants Russ and JLux Consulting)**

83.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of SUD treatment services, the Malibu Defendants, the Aliya Defendants, and Defendants Jennifer Russ and JLux Consulting have represented, directly or indirectly, expressly or by implication, that:

A.    The individuals answering consumers' calls are employed by the specific SUD treatment facility the consumers searched for or by an independent central SUD treatment admissions organization; and

B.    Clinical professionals in the field of addiction treatment are recommending Malibu Detox or Malibu Recovery after an objective assessment of the patient's individual history and needs and consideration of multiple treatment options.

84.    In fact, in numerous instances in which the Malibu Defendants, the Aliya Defendants, and Defendants Jennifer Russ and JLux Consulting have made the representations described in Paragraph 83:

A.    The individuals answering consumers' calls were not employed by the specific SUD treatment service the caller was trying to reach or by an independent central SUD treatment admissions organization; and

B.    Clinical professionals in the field of addiction treatment were not recommending Malibu Detox or Malibu Recovery after an objective assessment of the patient's individual history and needs and consideration of multiple treatment options.

85.     Therefore, the representations of the Malibu Defendants, the Aliya Defendants, and Defendants Jennifer Russ and JLux Consulting as described in Paragraph 83 were false or misleading and constitute deceptive acts or practices and the making of false advertisements in

31

violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

## VIOLATIONS OF THE OPIOID ADDICTION RECOVERY
## FRAUD PREVENTION ACT OF 2018

86.     The Opioid Addiction Recovery Fraud Prevention Act of 2018 ("OARFPA"),

P.L. 115-271, 15 U.S.C § 45d, was enacted on October 24, 2018. OARFPA prohibits unfair or

deceptive acts or practices with respect to any SUD treatment service or SUD treatment product.

15 U.S.C. § 45d(a). Section 8022 of OARFPA defines "substance use disorder treatment service"

to mean "a service that purports to provide referrals to treatment, treatment, or recovery housing

for people diagnosed with, having, or purporting to have a substance use disorder, including an

opioid use disorder." P.L. 115-271 § 802, 15 U.S.C. § 45d.

87.     Defendants Christopher LiVolsi, Robby Stempler, Dennis Rinker, Jennifer Russ,

Mercury Marketing, Malibu Detox, Behavioral Healthcare Group, JHEL Holdings, Fennaside,

LLC, JLux Consulting, Aliya Health Group, and Malibu Recovery Center have engaged in the

marketing of SUD treatment services as defined under OARFPA.

88.     Pursuant to 15 U.S.C. § 45d(b)(1), a violation of 15 U.S.C. § 45d(a) is treated as a

violation of a rule promulgated under the FTC Act regarding unfair or deceptive acts or

practices.

89.     Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of

15 U.S.C. § 45d(a) constitutes an unfair or deceptive act or practice in violation of Section 5(a)

of the FTC Act, 15 U.S.C. § 45(a).

90.     Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), and Section 8023(b) of

OARFPA, 15 U.S.C. § 45d(b), authorize this Court to grant such relief as the Court finds

necessary to redress injury to consumers resulting from Defendants' violations of OARFPA.

**Count IV – Deceptive Lead Generation Ads**
**(Mercury Defendants)**

91.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of SUD treatment services, the Mercury Defendants have represented, directly or indirectly, expressly or by implication, that:

A.     Search Ads the Mercury Defendants disseminate are advertisements for the SUD treatment facilities consumers searched for;

B.     The phone numbers in the Mercury Defendants' Search Ads are the phone numbers of the SUD treatment facilities consumers searched for; and

C.     Consumers who click-to-call or dial the phone numbers for the SUD treatment facilities displayed in the Mercury Defendants' Search Ads will reach the SUD treatment facilities they searched for.

92.     In fact, in numerous instances in which the Mercury Defendants have made the representations described in Paragraph 91:

A.     Search Ads the Mercury Defendants disseminated were not advertisements for the SUD treatment facilities consumers searched for;

B.     The phone numbers in the Mercury Defendants' Search Ads were not the phone numbers of the SUD treatment facilities consumers searched for; and

C.     Consumers who clicked-to-call or dialed the phone numbers for the SUD treatment facilities displayed in the Mercury Defendants' Search Ads did not reach the SUD treatment facilities they searched for.

93.     Therefore, the Mercury Defendants' making of the representations as described in Paragraph 91 constitutes deceptive acts or practices in violation of Section 8023(a) of OARFPA, 15 U.S.C. § 45d(a).

**Count V – Deceptive Lead Generation Ads**
**(Malibu Defendants and Aliya Defendants)**

94.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of SUD treatment services, the Malibu Defendants and the Aliya Defendants, through the Mercury Defendants acting on their behalf and for their benefit, have represented, directly or indirectly, expressly or by implication, that:

A.     Their Search Ads are advertisements for the SUD treatment facilities consumers searched for;

B.     The phone numbers in those Search Ads are the phone numbers of the SUD treatment facilities consumers searched for; and

C.     Consumers who click-to-call or dial the phone numbers for the SUD treatment facilities displayed in those Search Ads will reach the SUD treatment facilities they searched for.

95.     In fact, in numerous instances in which the Malibu Defendants and the Aliya Defendants, through the Mercury Defendants acting on their behalf and for their benefit, have made the representations described in Paragraph 94:

A.     Their Search Ads were not advertisements for the SUD treatment facilities consumers searched for;

B.     The phone numbers in those Search Ads were not the phone numbers of the SUD treatment facilities consumers searched for; and

C.     Consumers who clicked-to-call or dialed the phone numbers for the SUD treatment facilities displayed in those Search Ads did not reach the SUD treatment facilities they searched for.

96.     Therefore, the Malibu Defendants and the Aliya Defendants' making of the

representations as described in Paragraph 94 constitutes deceptive acts or practices in violation of Section 8023(a) of OARFPA, 15 U.S.C. § 45d(a).

## Count VI – Deceptive Telemarketing
### (Malibu Defendants, Aliya Defendants, and Defendants Russ and JLux Consulting)

97.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of SUD treatment services, the Malibu Defendants, the Aliya Defendants, and Defendants Jennifer Russ and JLux Consulting have represented, directly or indirectly, expressly or by implication, that:

A.     The individuals answering consumers' calls are employed by the specific SUD treatment facility the consumers searched for or by an independent central SUD treatment admissions organization; and

B.     Clinical professionals in the field of addiction treatment are recommending Malibu Detox or Malibu Recovery after an objective assessment of the patient's individual history and needs and consideration of multiple treatment options.

98.     In fact, in numerous instances in which the Malibu Defendants, the Aliya Defendants, and Defendants Jennifer Russ and JLux Consulting have made the representations described in Paragraph 97:

A.     The individuals answering consumers' calls were not employed by the specific SUD treatment service the caller was trying to reach or by an independent central SUD treatment admissions organization; and

B.     Clinical professionals in the field of addiction treatment were not recommending Malibu Detox or Malibu Recovery after an objective assessment of the patient's individual history and needs and consideration of multiple treatment options.

99.     Therefore, the making of the representations as described in Paragraph 97 by the

Malibu Defendants, the Aliya Defendants, and Defendants Jennifer Russ and JLux Consulting

constitutes deceptive acts or practices in violation of Section 8023(a) of OARFPA, 15 U.S.C. §

45d(a).

## VIOLATIONS OF THE TRADE REGULATION RULE ON IMPERSONATION OF GOVERNMENT AND BUSINESSES

100.    The Impersonation Rule, promulgated by the FTC under Section 18 of the FTC

Act, 15 U.S.C. § 57a, became effective on April 1, 2024, and remains in full force and effect.

The Impersonation Rule is codified at 16 C.F.R. Part 461.

101.    Section 461.3(a) of the Impersonation Rule prohibits "materially and falsely

pos[ing] as, directly or by implication, a business or officer thereof, in or affecting commerce as

commerce is defined in the Federal Trade Commission Act (15 U.S.C. 44)."

102.    The Impersonation Rule defines "materially" to mean "likely to affect a person's

choice of, or conduct regarding, goods or services." 16 C.F.R. § 461.1. The Impersonation Rule

defines "business" to mean "a corporation, partnership, association, or any other entity that

provides goods or services, including not-for-profit entities." *Id*.

103.    Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of

the Impersonation Rule constitutes an unfair or deceptive act or practice in or affecting

commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Section 19(b) of the

FTC Act, 15 U.S.C. § 57b(b), authorizes this Court to grant such relief as the Court finds

necessary to redress injury to consumers resulting from violations of a rule under that

subchapter.

### Count VII – Posing as a Business
### (Mercury Defendants)

104.    In numerous instances on or after April 1, 2024, in connection with the

advertising, marketing, promotion, offering for sale, or sale of SUD treatment services, the Mercury Defendants have materially and falsely posed as, directly or by implication, the specific SUD treatment facilities that consumers searched for.

105.    Therefore, the Mercury Defendants' representations as set forth in Paragraph 104 violate Section 461.3(a) of the Impersonation Rule, 16 C.F.R. § 461.3(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

106.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, OARFPA, and the Impersonation Rule.

107.    Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## CIVIL PENALTIES

108.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes this Court to award civil penalties for each violation of OARFPA.

109.    Each dissemination of an advertisement or phone call in which Defendants violated OARFPA by making one or more of the deceptive representations described above constitutes a separate violation for which the FTC seeks monetary civil penalties.

110.    Defendants violated OARFPA with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

111.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes this Court to award civil penalties for each violation of the Impersonation Rule.

112.    Each dissemination of an advertisement in which the Mercury Defendants

violated the Impersonation Rule by making one or more of the deceptive representations described above constitutes a separate violation for which the FTC seeks monetary civil penalties.

113. The Mercury Defendants violated the Impersonation Rule with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## **PRAYER FOR RELIEF**

Wherefore, the FTC requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act, OARFPA, and the Impersonation Rule;

B. Award monetary and other relief within the Court's power to grant;

C. Impose civil penalties for each violation of OARPFA and the Impersonation Rule; and

D. Award any additional relief as the Court determines to be just and proper.

Date: June 24, 2025

Respectfully submitted,

ELIZABETH JONES SANGER
STACY N. CAMMARANO
ROBERT VAN SOMEREN GREVE
TIFFANY M. WOO
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Mail Stop CC-6316
Washington, DC 20580
Tel: (202) 326-2757, -3308, -2523 -3583
Email: esanger@ftc.gov
        scammarano@ftc.gov
        rvansomerengreve@ftc.gov
        twoo@ftc.gov

*Attorneys for Plaintiff*
FEDERAL TRADE COMMISSION